**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| CHRISTOPHER TITA and IJANG FOMUKONG-TITA, individually and on behalf of all others similarly situated, | Case No.: |
| *Plaintiffs*, | |
| v. | |
| THE UNITED STATES, | |
| *Defendant*. | |

**FILED**

**17-1461 L**

Oct 5 2017

U.S. COURT OF
FEDERAL CLAIMS

## CLASS ACTION COMPLAINT

Plaintiffs Christopher Tita and Ijang Fomukong-Tita bring this Class Action Complaint against Defendant The United States to seek just compensation for the taking of Plaintiffs' and the Class's (defined below) private property for public use when the U.S. Army Corps of Engineers flooded their homes by releasing water from the Addicks and Barker reservoirs in Houston, Texas. Plaintiffs, for their Complaint, allege as follows upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by their attorneys:

### STATEMENT OF JURISDICTION

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491(a)(1) as this action seeks monetary compensation from the United States, pursuant to the Fifth Amendment to the U.S. Constitution, for its taking of Plaintiffs' and the Class's private property for public use, without just compensation.

### PARTIES

2.      Plaintiff Christopher Tita is a citizen of the United States of America and resident of the State of Texas.

3.     Plaintiff Ijang Fomukong-Tita is a citizen of the United States of America and resident of the State of Texas.

4.     Defendant is the United States of America.

## PREVIOUS LAWSUITS

5.     Plaintiffs have not filed any other lawsuits in state or federal court dealing with the same or similar facts involved in this action.

## STATEMENT OF THE CLAIM

6.     On August 25, 2017, one of the worst hurricanes in over a decade made landfall in Southeast Texas. In an effort to prevent catastrophic flooding in Houston, the U.S. Army Corps of Engineers—a U.S. federal agency under the Department of Defense—attempted to control the flow of the storm's heavy rainfall by releasing water from two nearby dams, the Addicks and Barker reservoirs.

7.     As a result of Defendant's decision to release water from Addicks and Barker, approximately 4,000 homes that were not otherwise going to flood during the storm, were inundated with water, suffered devastating damage, and became largely uninhabitable. Thousands of families, including Plaintiffs and the Class, are now displaced from their homes with no assurances from Defendant of whether they will be compensated for the damage it caused to their private properties. Therefore, thousands of families are left not knowing where they will sleep, whether they will be able to afford temporary shelter, or whether they will be able to afford to rebuild their homes.

8.     While the release of water from Addicks and Barker was likely necessary to protect downtown and other parts of Houston from even greater damage, Plaintiffs and a Class of similarly situated individuals are now disproportionality burdened by Defendant's intentional

flooding of their private properties and, therefore, seek just compensation.

9.      The following is an overview of Hurricane Harvey, the Addicks and Barker reservoirs, the decision to release water from Addicks and Barker, and the resulting damage to Plaintiffs' homes.

**I.      An Overview of Hurricane Harvey.**

10.     Hurricane Harvey was one of the most devastating hurricanes to make landfall in the United States in over a decade.

11.     Harvey first made landfall on August 25, 2017 near Rockport, Texas, approximately 30 miles from Corpus Christi. As Harvey traveled through the southeastern portion of the State, it brought with it tropical storm-force winds and heavy rainfall.

12.     In just a four-day period, parts of southeast Texas received 40–52 inches of rain and experienced catastrophic inland flooding that submerged hundreds of thousands of homes, displaced tens of thousands of people, and resulted in dozens of deaths.

13.     Harvey is being recognized as the worst natural disaster in Texas history.

**II.     The U.S. Army Corps of Engineers Created the Addicks and Barker Reservoirs to Protect Houston from Catastrophic Floods, Including from Hurricanes like Harvey.**

14.     The Addicks and Barker reservoirs are part of a flood control system on the west side of Houston, Texas.

15.     The dams are owned and operated by the U.S. Army Corps of Engineers, and were designed specifically to protect downtown Houston from catastrophic flooding after a major flood inundated the City in 1935.

16.     The dams protect Houston from floods by controlling the flow of water in the largest waterway running through the heart of the City, the Buffalo Bayou.

17.     Addicks and Barker function as "dry reservoirs", meaning the dams stay open and

water is allowed to flow freely until heavy rainfall. Once the system's flood gauges reach certain

levels, the dams' floodgates close and they begin to fill to prevent the overflow of uncontrollable

water in the Bayou.

**III.    On August 28, 2017, the U.S. Army Corps of Engineers Began Releasing Water from the Addicks and Barker Reservoirs and, In Turn, Flooded Thousands of Nearby Homes that Would Not Have Otherwise Flooded During Hurricane Harvey.**

18.    As Hurricane Harvey approached, the Addicks and Barker reservoirs were in the

middle of a $75 million repair, after they were deemed to be in "extremely high risk of

catastrophic failure" in 2009.

19.    While the dams initially took on hundreds of acre-feet of water from Hurricane

Harvey, the U.S. Army Corps of Engineers made clear that if the reservoirs' water levels rose to

a certain point, they would begin releasing water rather than risk losing either dam entirely.

20.    On August 28, 2017, the U.S. Army Corps of Engineers began releasing water

from both Addicks and Barker.

21.    As both reservoir gates opened and released storm water into the Buffalo Bayou,

adjacent neighborhoods and roadways that were not otherwise flooded became inundated with

water.

22.    As a result, at least 3,000 homes near the Addicks reservoir and 1,000 homes near

Barker were flooded.

23.    Unfortunately, without power, many residents, including Plaintiffs and the Class,

did not receive notice before the release. Many residents, including Plaintiffs and the Class, were

therefore caught off guard and were mostly unable to mitigate the damage to their homes, family

heirlooms, and personal belongings.

24.    For many people in that area, including Plaintiffs and the Class, once they were

able to return to their homes and properties, they had to begin a several year long process to salvage and rebuild what is left, if anything.

25.     For instance, if water levels stayed under four feet inside homes, the Federal Emergency Management Agency ("FEMA") recommends to document the damage and then identify what can be saved and what cannot. FEMA then recommends to strip homes of all furnishings and other items impacted by water, rip up carpet, remove the first four feet of drywall and insulation on the ground level and, if the water rose above four feet, to rip entire walls out.

26.     Importantly, the Center for Disease Control ("CDC"), together with FEMA, the Environmental Protection Agency, the U.S. Department of Housing and Urban Development, and the National Institutes of Health, specifically recommend that flooded homes be *completely* dried out within 24–48 hours of water exposure in an effort to prevent hazardous mold growth. The CDC also reports that buildings wet for more than 48 hours, like Plaintiffs' home, will generally support visible and extensive mold growth and should be remediated, and excessive exposure to mold-contaminated materials can cause adverse health effects in susceptible persons regardless of the type of mold or the extent of contamination.

27.     For Plaintiffs and the Class, because the U.S. Army Corps of Engineers released water from both Addicks and Barker during Hurricane Harvey, their homes flooded and many are now uninhabitable and require hundreds of thousands of dollars in repairs. Unfortunately, Defendant has not yet assured Plaintiffs or the Class whether they will be compensated for the damage it caused to their private properties. As such, Plaintiffs and the Class are left not knowing where they will sleep, whether they will be able to afford temporary shelter, or whether they will be able to afford to rebuild their homes. Because Defendant has not stated whether it will help compensate victims of the Addicks and Barker release, many are unable to start the

process of rebuilding their homes and seeking any financial assistance to do so.

**IV.    Plaintiffs Christopher Tita's and Ijang Fomukong-Tita's Experience.**

28.     Plaintiffs Christopher Tita and Ijang Fomukong-Tita own a single-family home located near the Barker Reservoir.

29.     The Tita's have lived in their home since 1999 and, since then, had never once flooded. In fact, the Tita's home survived Tropical Storm Allison, Hurricane Ike, the Memorial Day flood of 2015, and the Tax Day flood of 2016 without flooding. Not surprisingly, the Tita's mortgage lender did not require flood insurance. For these reasons, the Tita's did not maintain flood insurance under the National Flood Insurance Program.

30.     The Tita's home even survived the first few days of Hurricane Harvey without flooding, even though much of Houston was mostly underwater.

31.     Unfortunately, on August 28, 2017 that all changed. Early that morning, when the U.S. Army Corps of Engineers decided to release water from Addicks and Barker, the Tita's watched helplessly as water from the dams began heading towards their home.

32.     By morning, the water began spilling over the street curb onto their property. While the Tita's hoped that the water would stop, it didn't and it ultimately entered their home.

33.     Eventually, the Tita's were forced to evacuate. The water rose to a level of several feet inside the Tita's home and stood for over ten (10) days.

34.     As of the date this Complaint was filed, the Tita's home is uninhabitable. Initial estimates suggest that it will cost well into the six-figures to make the necessary structural repairs to the Tita's home and even more to repair and replace their other belongings.

**CLASS ALLEGATIONS**

35.     **Class Definition**: Plaintiffs bring this action on behalf of themselves and a Class

of similarly situated individuals, defined as follows:

> All persons or entities whose private properties were flooded as a direct result of the drainage of the Addicks and Barker reservoirs after U.S. Army Corps of Engineers discharged water from them beginning August 28, 2017.

Excluded from the Class are (1) Defendant or Defendant's agents, (2) the Judge to whom this case is assigned and the Judge's immediate family, (3) persons who execute and file a timely request for exclusion from the Class, (4) persons who have had their claims in this matter finally adjudicated and/or otherwise released, and (5) the legal representatives, successors, and assigns of any such excluded person.

36.     **Numerosity**: The exact number of members of the Class is unknown and is not available to Plaintiffs at this time, but individual joinder in this case is impracticable. The Class likely consists of thousands of individuals.

37.     **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include but are not limited to the following:

a)     Whether Plaintiffs and the Class have been deprived of the use, occupancy, and enjoyment of their homes and other property as a result of Defendant's conduct described above;

b)     Whether Defendant's conduct described above constitutes a taking of private property for public use and without just compensation under the Fifth Amendment to the U.S. Constitution; and

c)     Whether Plaintiffs and the Class are entitled to just compensation for Defendant's conduct described above.

38.    **Typicality**: Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and the Class sustained damages as a result of Defendant's uniform wrongful conduct.

39.    **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interest of the Class, and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Class.

40.    **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class, and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply and affect members of the Class uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs. The factual and legal bases of Defendant's liability to Plaintiffs and to the other members of the Class are the same, resulting in injury to the Plaintiffs and to all of the other members of the Class. Plaintiffs and the members of the Class have suffered harm and damages as a result of Defendant's conduct.

41.    **Superiority**: This case is also appropriate for certification because class proceedings are superior to the other available methods for the fair and efficient adjudication of

this controversy. Absent a class action, it would be difficult for the individual members of the

Class to obtain effective relief from Defendant. Even if members of the Class themselves could

sustain such individual litigation, it would not be preferable to a class action because individual

litigation would increase the delay and expense to all parties and the court and require

duplicative consideration of the legal and factual issues presented herein. By contrast, a class

action presents far fewer management difficulties and provides the benefits of single

adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of

time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

42.     Plaintiffs reserve the right to revise the foregoing "Class Allegations" and "Class

Definition" based on facts learned through additional investigation and discovery.

**FIRST CAUSE OF ACTION**
**Violation of the Takings Clause**
**(On behalf of Plaintiffs and the Class)**

43.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

44.     The Fifth Amendment to the United States Constitution prohibits the Government

from taking private property for public use without just compensation.

45.     Plaintiffs and the Class have a legally-protectable property interest in their homes

and other properties located near the Addicks and Barker reservoirs.

46.     Plaintiffs and the Class had distinct, reasonable, and investment-backed

expectations that their properties would only be subject to flooding in line with historical

flooding patterns established over the decades.

47.     As a direct result of the U.S. Army Corps of Engineers' decision to discharge

water from the Addicks and Barker reservoirs on August 28, 2017, Plaintiffs' and the Class's

homes and other private properties were flooded, which deprived Plaintiffs and the Class of the

use, occupancy, and enjoyment of their homes and other properties.

48.     Specifically, Defendant's conduct described above constitutes a temporary taking of Plaintiffs' and the Class's private property because starting on August 28, 2017 and continuing for weeks after, water was released from Addicks and Barker and, in turn, flooded Plaintiffs' and the Class's homes and properties. As a result, Plaintiffs and the Class are not able to return to their homes and properties, and are deprived of the use, occupancy, and enjoyment of their private property.

49.     Defendant's conduct described above also constitutes a permanent taking of Plaintiffs' and the Class's private property because after they are able to return to their homes and properties, the intentional discharge of water from Addicks and Barker will have caused permanent damage to their private property that will cost tens or hundreds of thousands of dollars to repair.

50.     Plaintiffs' and the Class's private property would not have otherwise flooded but for the U.S. Army Corps of Engineers' decision to discharge water from the Addicks and Barker reservoirs.

51.     The U.S. Army Corps of Engineers' decision to discharge water from the Addicks and Barker reservoirs was for public use.

52.     Plaintiffs and the Class have not been compensated for temporary or permanent taking of their homes and other private property by the U.S. Army Corps of Engineers.

53.     The Fifth Amendment is intended to prevent the public from burdening one individual, such as Plaintiffs and the members of the Class, with the costs of furthering public interest.

54.     Therefore, on behalf of themselves and the Class, Plaintiffs seek just

compensation for the temporary and permanent takings of their homes and other property in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Christopher Tita and Ijang Fomukong-Tita, on behalf of themselves and the Class, respectfully request that this Court enter an order:

A.      Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiffs as representatives of the Class, and appointing their counsel as Class Counsel;

B.      Declaring that Defendant's actions, as set out above, constitute a taking under the Fifth Amendment to the United States Constitution;

C.      Ordering Defendant to notify Plaintiffs and the Class of its intention to compensate them for its taking under the Fifth Amendment to the United States Constitution;

D.      Awarding just compensation in an amount to be determined at trial;

E.      Awarding Plaintiffs and the Class their reasonable litigation expenses and attorneys' fees;

F.      Awarding Plaintiffs and the Class pre- and post-judgment interest, to the extent allowable; and

G.      Awarding such other and further relief as equity and justice may require.

Respectfully submitted,

**CHRISTOPHER TITA** and **IJANG FOMUKONG-TITA**, individually and on behalf of all others similarly situated,

Dated: October 5, 2017                    By: s/ Jay Edelson

Jay Edelson
jedelson@edelson.com

11

EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Attorney of Record for Plaintiffs and the Putative
Class*

Rafey S. Balabanian
rbalabanian@edelson.com
Benjamin H. Richman
brichman@edelson.com
EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

William Consovoy
will@consovoymccarthy.com
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
Tel: 703.243.9423

Hon. Dwight E. Jefferson (Ret.)*
djefferson@coatsrose.com
COATS ROSE PC
9 Greenway Plaza, Suite 1100
Houston, Texas 77046
Tel: 713.651.0111
Fax: 713.651.0220

*Of Counsel for Plaintiffs and the Putative Class*

*\*Admission to be sought.*